## Whitlow v. Beadles et al.

Dec. 5, 1944.

Farland Robbins for appellants.

J. E. Warren and F. B. Martin for appellees.

754

Opinion of the Court by Morris, Commissioner—
Affirming.

R. D. Emerson was owner of a small tract of land
near the village of Sedalia in Graves County, and in 1914
he and others established "Emerson Sub-Division," and
held a sale of lots. His part of the sub-division included
about 6 acres divided into 54 lots, each 25 feet wide and
182 feet deep. Twenty-seven fronted on the highway
which ran east and west, and a like number in the rear of
an alley faced Emerson Street. Emerson had sold many
of these lots to various purchasers and had in turn
bought some back prior to sale to Ford by Emerson's
heirs. The project failed. Mr. Emerson died prior to
1932, and in that year his widow and heirs conveyed to
Ford what remained of the sub-division tract. The deed
recites: "Beginning in the center of the Wingo and
Farmington road at the s.w. corner of a lot conveyed by
Emerson to C. E. Johnson, Deed Book 52, p. 265; thence
west along the center of said road to the s. e. corner or
opposite of said corner to lot No. 14, in the Emerson plat
of addition of the town of Sedalia, which is of record in
Deed Book 55, p. 1; thence north along the line be-
tween lots 13 and 14 a distance of 191½ feet to center
of an alley; thence west along the center of said alley
350 feet to the west line of said lot 28, a distance of 191½
feet to the south line of Emerson Street, as shown by
said plat; thence east along the south line of said street
a distance of about 675 feet to the n.e. corner of lot No.
54, it being Moffett's line; thence south along Moffett's
line and along the west line of Johnson lot 383 feet to
the beginning corner. For a complete description of said
property reference is hereby made to the Emerson
plat * * *."

The deed further provided that the conveyance
"embraces and specifically includes lots Nos. 1 to 13,
28 to 54, all inclusive," 27 lots in the rear and 13 front-
ing on the highway. In January 1938 Whitlow agreed
to buy Ford's holdings at the price of $1900, and Ford
executed to Whitlow and wife a deed which contained
the precise description contained in the Emerson-Ford
deed. On lots 6 and 7 there was a five room bungalow
with garage and outhouses. These improvements were
there when Ford purchased and title to these lots passed
under the Ford deed and appellants took possession of
them and other lots embraced in the deed, making some
improvements on the house.

In September 1939 Hester Andrus told Whitlow that he was cultivating a part of his land. The two inspected the plat and Whitlow was convinced that Andrus owned lots 20 to 24, inclusive (not specifically included in the deed). Whitlow employed an attorney to make abstract with the result that it showed that 13 of the 40 lots which Whitlow claimed had been shown to and bought by him, belonged to prior Emerson vendees whose deeds were of record.

As best we can make of the proof, Whitlow claimed lots 1 to 5, conveyed by Emerson to Johnson in 1911 and 1913, and lots 50 to 54 conveyed to W. F. Moffett in 1924, and lots 28, 29 and 30 apparently conveyed to Moffett in 1919 to make up the lineal shortage. Whitlow demanded of Ford the proportionate part of the purchase price paid. The upshot was that a few days after the conference Ford and wife and Emerson heirs, filed a petition against Whitlow and wife asking a reformation of the two deeds, on the ground that the 13 lots had been included in each deed by mutual mistake, and by mistake of the draftsman who had prepared the deeds. Ford plead alternatively fraud on the part of Whitlow, because at the time of purchase he knew the 13 lots belonged to others. Appellant then filed common-law action against Ford and wife seeking damages for breach of warranty. The shortage claim was based on the ratio of footage actually conveyed to the total of footage of 40 lots mentioned in the deed, and claimed to have been represented by Ford as being 325 feet frontage on the highway and 675 feet in the rear.

They allege that Ford had displayed his deed "which contained the description as set out, and represented that he was the owner of all said property and held good title thereto." They conceded that Ford "had no intention to defraud, but nevertheless his representations were untrue, and they were misled." The contention is that they bought the property on the basis of footage, and that there is a deficiency of more than 10 per cent of the land paid for.

Appellants answered by way of general denial. The court without objection sustained Ford's motion to transfer the Whitlow case to the equity docket and consolidate it with the equity case. Thereafter the Fords answered in denial, admitting that they had never obtained title to any of the 13 lots in question, but deny-

ing a deficiency of the frontage. They alleged that Whitlow knew that the 13 lots had never been conveyed to Ford, and that Whitlow recognized that the value of the property conveyed lay chiefly in the lots upon which were the improvements, and that they and the other lots were worth more than the price paid. A reply in denial completed the issues. Upon proof, pleadings and exhibits the chancellor found that each of the deeds embraced 13 lots and lineal footage not intended to be conveyed, included in the deeds by mutual mistake. He directed the deed reformed so as to exclude the 13 lots, and adjudged that appellants take nothing.

There is no contention that the Emerson heirs had title to the 13 lots, hence their deed carried no title through Ford to the Whitlows, who alleged that they "have never been in possession of the lots to which they learned they had no title on account of their grantors having had no title," but that the rightful title holders had been in possession. The proof shows that a real estate agent negotiated the sale of the property to Ford. He did not know the boundaries, but thought Ford and the Emersons were well acquainted with the Emerson place. The agent had the county court clerk to write the deed to "the Bob Emerson place." He said the clerk had all the records, and that everybody knew the Bob Emerson place. He assumed the clerk would exclude all lots, titles to which had theretofore passed to others by deeds of record. In other words, he "left the clerk to get the description from the records." The scrivener did not testify, but it is easy to understand, if it were left to him to examine the many deeds from Emerson of various lots and reconveyances of many of the same lots, how he made the error. Ford fell into like error. He had a clerk write the Whitlow deed, and as he recalled it he merely handed the Emerson deed to the scrivener to "write the Whitlow deed by."

Ford testified that before he bought the property he went on the ground and was shown and purchased the boundary which it was proposed to be conveyed. An exhibit filed with Ford's testimony shows that this boundary excluded the lots owned by Johnson, the Burton heirs, Andrus and Moffetts, held by them under prior conveyances. He said that he pointed out to Whitlow the same boundary. He did not then know their deed included other lots, and further that he did not take

possession of any lots outside his boundary, though he pastured some of the Andrus lots. Lots 1 to 5, inclusive, had been owned by and in occupancy of the Johnsons for many years, and while included in the deeds Ford knew that he had no claim to them and did not represent to Whitlow that he had title. He was positive that he told Whitlow that the Burton heirs and Andrus owned some of the lots south of lot No. 14, but he didn't know how many lots. When he and Whitlow inspected the property they examined the Emerson deed; Ford insists that he pointed out the boundary, but was uncertain as to whether or not he followed the description in the Emerson deed. He also said that he handed the deed to Whitlow. He denied that he told Whitlow that there was a 325 frontage on the Wingo road or the frontage claimed on Emerson Street, but sold only the boundary pointed out, most of which was enclosed by fence.

Whitlow testified that when he and Ford looked over the property Ford showed him the deed; they stood at the driveway next to Mrs. Johnson's house, and taking the Johnson lot as a beginning point Ford said he had 325 feet from that point west on the Wingo Road; that Ford took the deed and read the description as it was written; that they walked to the back of the property; Ford again read the deed and said there were 675 feet on the back line, but told Whitlow there was a piece of ground within the fence which he did not own. Whitlow learned later that the beginning point which he thought was at lot No. 1 was in fact at lot No. 6, Johnson property, which it develops had the home and outbuildings on it, and which Whitlow knew had been occupied by the Johnsons for many years. Whitlow said that he accepted the proposal with the belief that the description in the deed from Emerson to Ford was correct.

When the deed was delivered Whitlow compared it with the Emerson deed; saw that it contained lots embraced therein, and although he knew it contained some which were then owned by others, accepted it and had it recorded. In his testimony he said frankly that he knew he wasn't supposed to get the Johnson lots, and that Ford told him that he did not own some of the lots in the rear on Emerson Street.

It is unnecessary to go further into details in recital of proof. It is clear to us that there was ample evidence upon which the court, in doing precise justice,

could and did direct the reformation of each of the deeds. This having been done, it followed as a sequence that appellant's claim failed, though, as we read the record, the court was also justified in his holding that appellant should not recover on his alleged breach of warranty. Before there can be a recovery on such basis it must be shown that the grantee should have first suffered damage. In this respect there was a failure, since Whitlow himself shows that the value of whatever frontage he got, aside from the improvements, was in his estimation more than the consideration paid by him. Ford here plead mistake and fraudulent knowledge, and further that the grantee had gotten the quantity of land agreed to be conveyed, and for a consideration not inadequate. On this last point Whitlow seems to agree.

The issue as between (appellant Whitlow) and the Ford heirs, appellees (Ford died during pendency), really triable by jury, was submitted to the chancellor in the consolidated cases without complaint. Under these circumstances we are not at liberty to reverse the finding of the chancellor unless we have more than a doubt that his judgment was not supported by substantial evidence. After a survey of the record before us we are of the opinion that the chancellor was correct in his order directing reformation of the deeds, and that appellants did not at all sustain the burden of showing damage by reason of any alleged shortage in the quantity actually sold. The court did as near exact justice between the parties as could reasonably be done.

Our conclusion obviates the necessity of discussing the motion of appellees (passed to merits) to dismiss the appeal on the ground that during the pendency of the appeal appellant had parted with title to the land found by the court to have been the boundary purchased. We are also of the opinion that the court correctly allocated the costs in the lower court.

Judgment affirmed.